and glaringly illogical to interpret the statute as requiring future suits to be commenced at a time prior to September 1st, the effective date of the Act.

A careful consideration of the language of the statute, its history and what may be gleaned from Congressional purpose makes it clear that the asserted interpretation of the Act is unfair, unjust and obviously contrary to the legislative objective.

The motion to dismiss is denied.

Arthur R. SMITH

v.

The UNITED STATES.

No. 49522.

United States Court of Claims.

Nov. 30, 1954.

Claude L. Dawson, Washington, D. C., for plaintiff.

Francis X. Daly, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This is a suit by a warrant officer of the United States Army for certain monies which he delivered to an agent of the United States in France, and which he asserts are wrongfully withheld from him.

The issue arises in this way: On September 14, 1945, and for a short time prior thereto, plaintiff was an assistant disbursing officer and Class B Agent finance officer in the United States Army at an airfield just out of Paris, France. As such official he had under his control an average of $100,000 which was money belonging to the United States. Plaintiff's immediate assignment was exchanging currency for personnel arriving in or leaving France. Plaintiff was in charge of the exchange booth and was responsible for the exchange operations in the course of which he handled the currency of all allied countries.

By previous arrangement made by his sergeant, he, on September 14, 1945, met a French civilian for the purpose of making a black-market exchange of British pounds for French francs. Plaintiff had with him 1,000 British pounds which were the property of the United States which he had taken from the finance office without authority. The French black-market operator had 165,000 French francs in varying denominations. Among them were nine 5,000-franc notes. Plaintiff refused these notes because Army regulations and directives forbade possession of notes of this denomination, and the French civilian agreed to change them for notes of smaller denomination.

While they were engaged in the transaction and after plaintiff had turned over to the French civilian 500 of the British pounds and received 120,000 French francs two agents of the Criminal Investigation Division (CID) of the United States Army arrested the plaintiff. At about the same time a French police inspector took the French operator into custody. Plaintiff was taken to headquarters and after being advised of his rights made an oral statement which was reduced to writing and signed by him. He voluntarily told the CID agents that he had in his foot locker at his quarters at the airfield $13,000 in American money and offered to surrender it to them.

The next day at his quarters plaintiff unlocked his foot locker and took out a shoeshine box from the bottom of which he removed a money belt containing a cellophane bag. He took the bag out of the belt. This bag contained 135 one-hundred-dollar bills in United States currency. The CID agents took the money and signed a receipt for it.

Plaintiff was tried by general court-martial on two charges, the second of which contained two specifications. These are set out in finding 4. He pleaded guilty to the two specifications of Charge No. 2, but on trial was found guilty on both charges.

The substance of these charges was (1) that he had embezzled 1,000 British pounds, the property of the United States; (2) violated an Army directive prohibiting the importing of United States currency into France, and (3) violated an Army directive prohibiting the possession of United States currency in France.

Plaintiff was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances due or to become due, to be confined at hard labor for three years, and to pay the United States a fine of $5,000.[1]

Upon release after serving his sentence plaintiff demanded the return of the $13,500 which he had turned over to the CID agents following his arrest. The demand was refused. The money

[1]. The fine of $5,000 was on July 16, 1946, remitted by direction of the President of the United States.

had been deposited in the United States Treasury, Miscellaneous Receipts, on February 14, 1947.

Plaintiff enlisted in the Army in October 1940. At the time he did not own any stocks or bonds and did not have any bank account. He served as a private for one year, and eventually became a staff sergeant. He was married in December 1941 and at the time he went overseas in April 1944 his pay was increased to a total of $289.50 per month. At that time he had one child and made an allotment out of his pay of $200 per month for the support of his wife and child.

Plaintiff's wife was not in good health and could not work, and was dependent upon the allotment of $200 per month from plaintiff on which to live. The plaintiff when he sailed for England in April 1944 took with him approximately $200 in United States currency. He was assigned to the Carrier Command at Ascot, England, in the fiscal office. After a few months he was made assistant disbursing officer and assisted in making disbursements to the troops, computed and checked vouchers, and supervised the different sections in the office. He made several flights to France to pay the troops in the line who were retrieving gliders after airborne operations. On those occasions he would take between $20,000 and $30,000 in French francs, amounting to from about 1,000,000 to 1,500,000 of such francs.

The $13,500 in United States currency which plaintiff took with him when he went to France, was according to his own story, accumulated in this way: while an assistant disbursing officer at Ascot, England, he handled currency of all allied countries. At the time plaintiff arrived in England he was required to deliver the $200 in United States currency to the defendant. It was against the Army regulations or directives for the personnel of the Army to retain in their possession in either England or France currency of the United States.

Plaintiff testified that in the latter part of May 1945 he made a trip to London, which was about 20 miles from As-cot; that he went to a club in London and met a Canadian soldier; that the Canadian soldier told plaintiff he had some Dutch guilders which he would exchange for pounds at a discount. Plaintiff gave to the Canadian soldier British pounds for Dutch guilders. Translated into American dollars at the official rate of exchange he secured some five or six thousand dollars' worth of Dutch guilders at the rate of seven cents per dollar. At that time at the American post exchange Dutch guilders were received under numerous restrictions at a valuation of 50 cents each. The plaintiff thus made a profit of 93 cents on each dollar's worth of Dutch guilders which he received. Within the next few days he had two other similar transactions with the same Canadian soldier, receiving in exchange Dutch guilders which he exchanged at the American post exchange for a total of $13,500 as a result of the three transactions. The American currency which he received in exchange for the Dutch guilders consisted of 135 one-hundred-dollar bills which were the same bills which plaintiff carried to France and delivered to the agents of the United States as heretofore stated.

Plaintiff testified that he traded for these Dutch guilders with his own money; that he had $200 when he went to England and had saved a total of $700 from his $89.50 per month, the amount remaining to him after his allotment was deducted; that these exchange transactions with the Canadian soldier were made wholly with his own money and that he did not use any United States funds in connection with such transactions.

However, in order to exchange funds at the post exchange at Ascot, England, for the currency of any other country the regulations required that a certificate be made out showing where the funds sought to be exchanged had been obtained, and the purpose for which the funds were to be used. Plaintiff did not do this, but used a contact man in the office and secured the exchange of funds in such a fashion that no record was made of the transaction. This was

admittedly in violation of the regulations or directives.

Plaintiff testified that from the $89.50 per month there was deducted $6.20 for insurance; that his incidental expenses, such as his mess bill at the officers' mess, meals away from the base, laundry and toilet articles, travel by buses and taxis, movies and other amusements, amounted to a total of about $30 per month, and that he saved about $50 per month which accounted for his having saved about $700 since his arrival in England.

There are some rather fantastic features of his dealings with the Canadian soldier. He testified that he did not know his name; that he met him at a club in London, but he did not know which club; he had forgotten how he first met him and although he met him three times he did not know what he looked like.

While it had been some time it rather seems that in three transactions involving what for him were considerable funds he might have been able to give some sort of description of the soldier. It is difficult to reach any conclusion other than that there was some effort to provide a cover up for an illegal transaction.

In handling several million soldiers in different foreign countries it was reasonably necessary to have some very careful restrictions on the handling of funds, and this is apparent from the directives and regulations which are on file in this case.

■ The plaintiff did not comply with the regulations and had no authority to exchange the Dutch guilders for American money without complying with the regulations. In other words, the United States did not agree to accept these guilders from the plaintiff under the circumstances. It was an illegal transaction unless the regulations were complied with. In these circumstances the defendant did not lose title to the United States bills in question. Buffum v. Peter Barceloux Co., 289 U.S. 227, 230, 236, 53 S.Ct. 539, 77 L.Ed. 1140.

■ If Neighbor A trades a calf to Neighbor B for a pig, it is a legal transaction and may inure to the benefit of both; but if Neighbor A takes his calf over without Neighbor B's knowledge, leaves the calf and takes Neighbor B's pig, he does not get title to the pig, even though he can show that the calf is worth as much or more. It is an ancient maxim of the law that a man may take his property that is illegally taken from him at any place he finds it if he is able to take it peaceably.

But it is claimed that if plaintiff never secured title to the United States bills that he nevertheless left with the United States Dutch guilders of equal value, and he is therefore entitled to recover the $13,500 as the value of the Dutch guilders which he delivered in underhanded fashion to the United States Government.

But there is no evidence that there was a market value in England at the time for Dutch guilders that were on the loose. True, the United States Government had fixed a value of 50 cents each for Dutch guilders at the post exchange, but this was surrounded with many restrictions. An officer or soldier who was going to another country must make a showing of the amount needed and could then draw no more than the amount of his salary plus 10 percent. There were restrictions governing taking money off of any soldier captured or slain. In order to prevent upsetting conditions all over the world great restrictions were necessary. Many countries during the stress of war forbade their currency from leaving the country. Trade transactions were handled through trade balances, sometimes through operations with third countries.

We do not have a copy in the record of the restrictions which England may have had on the handling of Dutch guilders, but undoubtedly as England and the United States were working closely together they must have had comparable restrictions. In other words, insofar as this record is concerned, there is not

shown to have been any open market for guilders in England at the time. If there had been an open free market for guilders in England it would seem absurd that a man who possessed them would sell them at seven cents on the dollar of their supposedly true value if he could take them to the market place or to a bank in England and secure their full value. Regardless of the rate, artificial or otherwise, which the American post exchange may have had for guilders to use as a basis for exchange under rigid restrictions, there is no evidence as to the actual value of guilders in England except for the three black-market transactions that are involved in this case. If guilders were legally in England no man in his right mind who possessed them would exchange them in a secret place at a rate of seven cents on the dollar of their value. This record does not have anything to show the value of guilders on the loose and out of the established Government channels in England in May 1945.

The record fails to show the value at the time and place of taking these guilders to be substantially more than the black-market price at the time and place of taking, whatever they may have been worth in Holland, and whatever they may have been worth had they gone through the regular channels of trade. The record does not show how the guilders arrived in England nor the sources from which they came. Nor does it show that they were treated as having an exchange value outside the regular channels which were apparently subject to the wartime restrictions.

■ The plaintiff occupied a confidential position in the United States Government. The allied countries were carrying on a war that had cost great loss of life, broken homes, and many billions of treasure. It was a vast and extensive operation. When illegal transactions of this kind are carried on under the stress of wartime conditions we are inclined to leave the parties where we find them.

■ Plaintiff had no contract with the United States Government in this particular operation. The legally constituted officials of Government did not authorize him to leave the guilders with the United States Government. His only claim for the value of these guilders is based upon an equitable claim to them and one of the oldest principles of equity jurisprudence is that he who comes into a court of equity must come with clean hands.

■ The plaintiff, while acknowledging his unlawful acts, insists that he has served his sentence and paid the penalty prescribed. That is true insofar as his illegal acts in France are concerned. But a glance at the court-martial verdict will disclose that it only covered his illegal acts in France. It in no way touched any illegal acts in England. Thus he has suffered no penalty for the manner in which he secured the Dutch guilders. The court-martial penalty would have no bearing on any effort on his part to recover the value of the guilders. The court-martial proceedings would have no effect on the transaction in England except as his admitted guilt when cornered in France might tend to bear upon the credit to be given his story as to the details of his accumulation of the Dutch guilders. To permit a financial officer of the Government to keep ill-gotten gains obtained in conscious violation of the rules governing the office with which he was connected would put a premium on misconduct. We desire to quote some of the principles laid down in the case of United States v. Carter, 217 U.S. 286, 305, 306, 317, 30 S.Ct. 515, 519, 524, 54 L.Ed. 769. This was a case where an officer of the United States had arranged a construction contract with some contractors and had a side agreement that he was to receive one-third of the profits. In commenting on his right to retain the money the Supreme Court uses the following language:

"If it be once assumed that the defendant Carter did secretly re-

ceive from Greene and Gaynor a proportion of the profits gained by them in the execution of the contracts in question, the right of the United States in equity to a decree against him for the share so received is made out. It is immaterial if that appears whether the complainant was able to show any specific abuse of discretion, or whether it was able to show that it had suffered any actual loss by fraud or otherwise. It is not enough for one occupying a confidential relation to another, who is shown to have secretly received a benefit from the opposite party, to say, 'You cannot show any fraud, or you cannot show that you have sustained any loss by my conduct.' Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerous precedent to lay down as law that unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity or benefit in violation of his duty, or acquires any interest adverse to his principal without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.

\*       \*       \*       \*       \*       \*

"The facts stated by the bill and supported by the evidence show that Carter received from Greene and Gaynor, directly or indirectly, something in excess of $500,000 as his share in the Greene and Gaynor contracts. Under the legal principle which we have heretofore announced, the United States may require Captain Carter to account for all he has received by way of gain, gifts, or profits out of the Greene

and Gaynor contracts, irrespective of the actual damage it has sustained or its ability to follow such gains into specific property. \* \* \* "

■ We feel that justice will have been fully done in this case if plaintiff is given a judgment for the sum of $972.50, the amount of money which he had to his credit at the time the illegal transactions were started. Judgment for plaintiff in the sum of $972.50.

It is so ordered.

WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

When the plaintiff, without complying with the regulations applicable to the exchange of foreign currency in an American finance office, obtained the 130 American $100 bills, he was guilty of embezzlement, or of the acquisition of the American money by fraud. In either case he did not have valid title to the American money. But he put in its place an amount, in Dutch guilders, that was, at the official rate of exchange, worth the same amount in American dollars.

By the exercise of the primitive remedy of self help, the American Government got back its 130 $100 bills. It took them out of the plaintiff's locker and put them into its pocket, and later into its treasury. It still has the Dutch guilders, or their value.

I would treat the plaintiff as courts have always treated such persons as lawyers, bankers, or other trusted persons who, in violation of their trust, convert desirable assets belonging to their clients to their own use, and put in the place of those desirable assets other less desirable assets. These embezzlers are sent to prison, as was the plaintiff. The embezzled assets, if they can be found, are restored to the rightful owner, as was done in this case. But to allow the victim of the embezzlement also to keep the assets which the embezzler put in place of the embezzled assets, as the court does in this case, that has never been done before, I think.

·Government counsel stated at the argument that the Dutch guilders which the plaintiff exchanged for the American dollars were worth to the Government as much as the dollars. I find this hard to believe, and, regardless of this concession, would give the Government the opportunity, if it requests it, to present evidence to show that the Government was financially harmed by the exchange. I would then give the plaintiff a judgment for the value of the guilders to the Government.

As to the plaintiff's ownership of the guilders, so far as the parties to this suit are concerned, no question has been raised. It is not contended that an American soldier who exchanged his money for foreign currency forfeited the foreign currency to the Government. He may have been punishable, for a violation of regulations, but forfeiture was not the prescribed punishment.

The Government, by its court martial, maintained its law by sending the plaintiff to prison. By self help, it recovered, in specie, the property which it had lost. It here contends that it is also entitled to the profits on the plaintiff's black market operations. I think its position is beneath the dignity of the Government.

LARAMORE, Judge, concurs in the foregoing dissent.

The TENNESSEE SOAP COMPANY,
v.
The UNITED STATES.
No. 95–52.

United States Court of Claims.
Nov. 30, 1954.