### TEXAS INSTRUMENTS, INC., Plaintiff,

v.

### HYUNDAI ELECTRONICS INDUSTRIES, CO. LTD., Hyundai Electronics America, Inc., and Hyundai Semiconductor America, Inc., Defendants.

### No. 2:98CV74(TH).

United States District Court, E.D. Texas, Marshall Division.

April 19, 1999.

Kenneth Robert Adamo, Jones Day Reavis & Pogue, Dallas, TX, Jay Carl Johnson, Texas Instruments Incorporated, Dallas, TX, Carl R Roth, Law Office of Carl R Roth, Marshall, TX, Jack William Campbell, IV, Gregory A Castanias, Jones Day Reavis & Pogue, Washington, DC, Barry Satine, Michael Covino, Jones Day Reavis & Pogue, New York City, for Texas Instruments Incorporated, plaintiff.

Thomas John Ward, Brown McCarroll & Oaks Hartline, Longview, TX, David J Beck, Beck Redden & Secrest LLP, Houston, TX, Danny Lloyd Williams, Williams Morgan & Amerson PC, Houston, TX, Kenneth L Nissly, Thelen Reid & Priest LLP, San Jose, CA, for Hyundai Electronics Industries Co Ltd, Hyundai Electronics America, Inc., Hyundai Semiconductor Amercia, Inc., defendants.

Elizabeth Ellen Mack, Locke Purnell Rain Harrell, Dallas, TX, Anthony de Alcuaz, Howard Rice Nemerowski Canady, Palo Alto, CA, for Nikon Precision Inc, movant.

Roderick M Thompson, Pillsbury Madison & Sutro, San Francisco, CA, for DNS Electronics LLC, movant.

## MEMORANDUM AND OPINION ORDER

HEARTFIELD, District Judge.

On May 1, 1998, Texas Instruments sued Hyundai[1] for patent infringement in this Court and in several other courts

---

1. As it has done throughout its previous orders, this Court will use "Hyundai" to refer

across the nation and, eventually, around the world. Simultaneously, Hyundai sued Texas Instruments for declaratory judgment and, eventually, patent infringement. All of these lawsuits were the fallout of the parties' differing interpretations of a patent cross-license agreement ("License Agreement") entered into on April 26, 1993. Rather than recap what amounts to a significant (but interesting) history between Texas Instruments and Hyundai, this Court refers readers to its *Texas Instruments, Inc. v. Hyundai Electronics, Memorandum and Opinion Order* [195] delivered February 4, 1999 wherein it discusses how and where the various lawsuits developed.[2]

Seven cases between Texas Instruments and Hyundai eventually ended up in this Court;[3] this case (the "'74 Case") was the first set for trial on Monday, March 8, 1999. However, on March 2, 1999 Hyundai filed a motion to amend its answer in all of the cases in this Court (including this case) seeking to add the defense of "patent misuse." Although this Court recognized the amendment for what it really was—a tactical pleading designed to delay entry of judgment should a jury return a verdict in favor of Texas Instruments—it nonetheless followed the mandate of the Fifth Circuit and permitted the dilatory amendment.[4] At Hyundai's invitation, this Court amended Hyundai's answer in this case and bifurcated the recently added patent misuse defense for a bench trial *after* the jury trial scheduled just six (6) days away. After approximately two days of deliberations, the jury returned a verdict of infringement against Hyundai and in favor of Texas Instruments assessing damages at twenty-five million, two-hundred thousand United States dollars ($25,200,-000.00). The jury further found that Hyundai wilfully infringed Texas Instruments' patents. After the jury returned a verdict of infringement against Hyundai and in favor of Texas Instruments, this Court tried the remaining defense of patent misuse. This patent misuse defense was tried to the Court and trial commenced on April 6, 1999, concluding on April 8, 1999 with the argument of the attorneys.

At the subsequent bench trial on patent misuse, this Court heard live witness testimony from four witnesses presented by Hyundai—Roy Weinstein, an economist; D.S. Kim, Hyundai Electronics Industries' director of worldwide sales; John Altmiller, a United States patent attorney; and Kyeong–Ran Lee, a Korean patent attorney. Similarly, Texas Instruments presented four live witnesses—Dr. William

---

collectively to the three defendants: 1) Hyundai Electronics Industries Company, Limited, 2) Hyundai Electronics America, Incorporated, and 3) Hyundai Semiconductor America, Incorporated. For the limited purposes of this opinion, there is no need to distinguish between these three Hyundai entities. If individual reference is necessary, this Court will so refer.

2. This Court's published, February 4, 1999 *Memorandum and Opinion Order* [195] interpreting the parties' License Agreement can be found on Westlaw at 1999 WL 179322 (E.D.Tex.). This Court continues to experience an extraordinary amount of deja vu throughout this patent misuse defense. It fully embraces, adopts, and endorses its February 4, 1999 *Memorandum and Opinion Order* [195].

3. In fact, three were transferred from the Eastern District of Virginia.

4. At the first day of the bench trial, counsel for Hyundai, Mr. Frankel, complained that "[t]his trial, Your Honor, has gone down at a very fast pace, obviously." *Trial Transcript April 6, 1999* p. 124. The Court responded to Mr. Frankel's concern: "It's only coming down rapidly, I think, by what appears to be the tactical design of Hyundai to submit an amended defense at an extremely late date in a trial. So any detriment that you may suffer because of that, it is because, I think, Hyundai may have brought the amendment up fairly late in the trial. So whatever short period of time is there is somewhat of Hyundai's own doing." *Id.* at p. 126. Specifically, this Court refers counsel for Hyundai (and any interested reader) to its *Memorandum and Opinion Order* wherein it *reluctantly* permitted Hyundai to amend its answer merely six (6) days before trial despite the dilatory findings delineated within that order.

Huber, an expert consultant on DRAM technology; Lloyd Zickert, a United States patent attorney; Richard Donaldson, Texas Instruments' chief patent counsel and director of Texas Instruments' licensing programs; and Dr. David Teece, an economist. The parties also presented various witnesses by deposition, and (since this is a continuation of the same case in which a patent-infringement trial was held before the jury) this Court enjoys the benefit of much testimony from that stage of the proceedings.

This Court has considered the pleadings; the evidence adduced at the trial, including the numerous trial exhibits submitted by the parties and the testimony of several experts in the fields of economics, Korean patent law, United States patent law, and other experts; the stipulations of record; and other materials submitted to this Court by the parties. This *Memorandum and Opinion Order* constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. All findings of fact are made by a preponderance of the credible evidence. Findings of fact may be contained in the section entitled "Conclusions of Law," and conclusions of law may be contained in the section entitled "Findings of Fact." In that event, the substance of the finding—not the Court's characterization—controls.

## I. FINDINGS OF FACT

### 1. Article 5.2(A)(ii)—The Sales Cap Provision That Won't Go Away[5]

So Article 5.2(A)(ii), we meet again. Article 5.2(A)(ii) is the "sale cap" termination

provision that automatically terminates the parties' License Agreement when Hyundai's worldwide sales of royalty bearing products reaches three billion eight hundred ninety-five million United States dollars ($3,895,000,000.00). The parties fell into a dispute over the proper interpretation of this unique provision. Texas Instruments argued that "royalty bearing products" included *all* products sold by Hyundai regardless whether those particular products were "covered by" a valid Texas Instruments patent—products which practiced a Texas Instruments patent, in force at the time the product is sold, in the country in which the sale occurs (the "TI Countries"). Hyundai disagreed. Hyundai argued that "royalty bearing products" were limited to products "covered by" a valid Texas Instruments patent—that is, products which practiced a Texas Instruments patent, in force at the time the product is sold, in the country in which the sale occurs. Hyundai's "covered by" interpretation of the term "royalty bearing products" is also known as the "TI Country Concept" interpretation of the parties' License Agreement. Both parties filed cross-motions for summary judgment urging their different interpretations of the sales-cap termination provision, Article 5.2(A)(ii).[6]

Obviously, termination of the License Agreement was the key to the dispute. So, when this Court interpreted the sales-cap provision of the parties' License Agreement, it began its analysis with the "Term & Termination" Article of the Li-

---

5. Throughout the parties' motions, briefing, and bench trial on Hyundai's defense of patent misuse, this Court experienced a tremendous amount of deja vu—particularly, since Hyundai's patent misuse defense hinges on its "TI Country Concept" and its "covered" versus "uncovered" products argument specifically rejected by this Court in its Court's February 4, 1999 *Memorandum and Opinion Order* [195]. In that opinion, this Court rejected Hyundai's "covered" versus "uncovered" products theory and found that, in fact, "royalty bearing products" included Hyun-

dai's worldwide products *regardless* of individual patent coverage by Texas Instruments of that product within the particular country in which that product was sold (the sheer wordiness involved in stating Hyundai's "TI Country Concept" points to its tortured ineptness).

6. Indeed, the Court received cross-motions, replies, and sur-replies. It also held an extensive hearing on the parties' differing interpretations of the License Agreement.

cense Agreement. Article 7.1 reads, in part:

> Except as otherwise provided in Article 7, this Agreement and the license granted pursuant hereto shall remain in force until December 31, 2000; *unless the Second Period terminates according to (ii) of Article 5.2(A)*, in which case this Agreement and the licenses granted pursuant hereto shall terminate upon termination of the Second Period, provided, however, any obligation on the part of HEI to pay to TI any sums under Article 5.2(B) of this Agreement, shall survive such termination.

*License Agreement* at 39 (emphasis added).

Article 5.2(A)(ii) of the License Agreement is the tinderbox that ignited this global litigation war between Texas Instruments and Hyundai. It is what spawned the parties' cross-motions for summary judgment. Now, it is the foundation of Hyundai's patent misuse defense.

Article 5.2(A) reads, in its entirety:

> In consideration for the licenses granted hereunder by TI to HEI during the period ("Second Period") commencing on January 1, 1996, and ending upon the first to occur of.
>
> (i) December 31, 2000, or
>
> (ii) *HEI's cumulative worldwide sales of ROYALTY BEARING PRODUCTS during the Second Period reaching an amount equal to the product of one and one-tenths (1.1) multiplied by three billion five hundred forty one million United States dollars (U.S.$3,541,000,000);*
>
> HEI shall pay to TI royalties in United States dollars, at a rate of eight percent (8%) of the NET SALES BILLED of all ROYALTY BEARING PRODUCTS

used, leased, sold or otherwise disposed of by HEI or its SUBSIDIARIES, during each calendar year of the Second Period, the amount payable, in each calendar year during the Second Period, not to exceed the following annual maximum amounts:

| Year | Annual Maximum |
|------|----------------|
| 1996 | U.S. $15,000,000 |
| 1997 | U.S. $15,000,000 |
| 1998 | U.S. $17,000,000 |
| 1999 | U.S. $18,000,000 |
| 2000 | U.S. $18,000,000 |

*License Agreement* at 30 (considerable emphasis added).

Obviously, in order to determine whether the sales cap had been reached, this Court had to define "royalty bearing products." Once the Court determined what "royalty bearing products" were, only simple arithmetic remained to see if the sales cap had indeed been triggered. Article 1.21 of the License Agreement defines "royalty bearing products." It reads, in its entirety:

> 1.21 "ROYALTY BEARING PRODUCTS" means items (c) and (d) set forth in Article 1.20, however, ROYALTY BEARING PRODUCTS shall not mean SEMICONDUCTIVE ELEMENTS, or SEMICONDUCTIVE APPARATUS, which are discrete devices such as transistors, photo transistors, diodes and SCRs.

*License Agreement* at 12. The language of this provision refers to yet another provision.[7] That is, in order to define "royalty bearing products" this Court had to look to "items (c) and (d) set forth in Article 1.20." *Id.* Article 1.20 reads, in its entirety:

> 1.20 "LICENSED PRODUCTS" means any of the following items (a) –(h) and parts thereof covered by any

---

7. All of this unnecessary cross-referencing and partial provision-incorporation is what left this fifty-five (55) page License Agreement susceptible to multiple interpretations (the legal profession has always been hesitant to simply say what it means without self-affirming legalese and complication). This Court found Hyundai's "TI Country Concept" interpretation of the License Agreement an unreasonable interpretation. Further, it found Texas Instruments' interpretation of the License Agreement the only reasonable interpretation of the parties' License Agreement.

claims(s) of HEI PATENTS, HEI—PARTICIPATION PATENTS, TI PATENTS, or TI–PARTICIPATION PATENTS:

(a) SEMICONDUCTIVE MATERIAL

(b) JUNCTION MATERIAL

*(c) SEMICONDUCTIVE ELEMENTS*

*(d) SEMICONDUCTIVE APPARATUS*

(e) TEST EQUIPMENT AND SYSTEMS

(f) PERSONAL COMPUTERS

(g) PERIPHERAL DEVICES

(h) GRAPHICS DISPLAY SYSTEMS

LICENSED PRODUCTS does not include: (i) DEFORMABLE DEVICES; (ii) DMD SYSTEMS; (iii) HETERO–JUNCTION BIPOLAR TRANSISTORS; or (iv) MONOLITHIC UNCOOLED DETECTORS.

*License Agreement* at 11 (emphasis added).

In its February 4, 1999 *Memorandum and Opinion Order* [195], this Court adopted Texas Instruments' proffered interpretation of the License Agreement, granted Texas Instruments' motion for partial summary judgment, and dismissed Hyundai's defense of license in all of the cases in this Court between Texas Instruments and Hyundai.[8] In that opinion, this Court specifically rejected Hyundai's "TI Country Concept" interpretation of the License Agreement as an unreasonable interpretation. The Court's reasons for rejecting Hyundai's "TI Country Concept" are exhaustively laid out in its February 4, 1999 *Memorandum and Opinion Order*. Some of this Court's reasons for rejecting Hyundai's "TI Country Concept" are listed below. Hyundai's "TI Country Concept"

interpretation of the parties' License Agreement:

1) created conflict among various provisions of the License Agreement, rendering some terms (indeed entire provisions) null and others redundant, that is, redundant;

2) resulted in the need for product-by-product, patent-by-patent, country-by-country litigation;

3) yielded the bizarre result that the same product-by-product, patent-by-patent, country-by-country determination would be required before a product was "licensed" for Hyundai's manufacture, use, or sale since under Article 1.20 of the License Agreement, a product must likewise be "covered" to be a "LICENSED PRODUCT;"

4) resulted in downstream purchasers of Hyundai's products not being licensed since, under the "first sale" doctrine of implied license, a product licensed to be sold by the seller remains licensed as it travels in the downstream product market and, conversely, a product unlicensed when sold does not protect downstream users from accusations of infringement; and

5) made the operation of the automatic sales-cap termination provision dependent on Hyundai's benevolence in determining whether or not to count products as "royalty bearing products."

For these reasons, and for others specifically delineated in its February 4, 1999 *Memorandum and Opinion Order*, this Court found, in part, the following:

Hyundai's proffered interpretation of Article 5.2(A)(ii) (the "sales cap" provision) of the License Agreement, the "TI

---

**8.** It also dismissed Hyundai's counterclaim for declaratory judgment in Civil Action No. 2:98–cv–73 (the "73 Case"). That counterclaim for declaratory judgment came to this Court from Hyundai's declaratory judgment action filed in the Southern District of New York on May 1, 1998—the same day Texas Instruments initiated its patent infringement litigation against Hyundai. In dismissing Hyundai's lawsuit, the Honorable Judge Patterson of the United States District Court for the Southern District of New York found that "[p]laintiff's [Hyundai's] actions... 'make a total mockery of [this Court's] order' and constitute a failure to participate in good faith in discovery ordered by the Court."

Country Concept," is an unreasonable interpretation of that provision and the License Agreement ... the only reasonable interpretation of Article 5.2(A)(ii) of the License Agreement and the License Agreement is that "royalty bearing products" are all semiconductive elements and semiconductive apparatus other than discrete devices such as transistors, photo transistors, diodes and SCRs ("semiconductive resistors").

Further, this Court found that as of May 1, 1998 (the day Texas Instruments filed its first patent infringement lawsuit against Hyundai) the parties' License Agreement had indeed terminated, thereby subjecting Hyundai to lawsuit for patent infringement. This Court thought this fifty-nine (59) page opinion interpreting Article 5.2(A)(ii) and the License Agreement had—once and for all—laid Hyundai's bizarre "TI Country Concept" to rest. Nope.

## 2. The Parties' Contentions

On March 2, 1999 Hyundai filed a motion to amend its answer in all of the cases in this Court (including this case) seeking to add the defense of "patent misuse." In this particular case, the "74 Case," Hyundai sought to amend its answer to add a "Sixth Affirmative Defense" of "patent misuse" *merely six (6) days before the scheduled jury trial.* On March 5, 1999, pursuant to Fed.R.Civ.P. 15(a), this Court reluctantly granted Hyundai's dilatory motion to amend. At Hyundai's suggestion, it bifurcated this Sixth Affirmative Defense of patent misuse for a subsequent bench trial.

Nevertheless, the jury trial (set for just two (2) days after this Court granted Hyundai's motion to amend) proceeded. This Court held a jury trial on Texas Instruments' infringement claims from March 8 to March 25, 1999. On March 25, 1999, the jury returned a verdict that Hyundai had infringed Texas Instruments' United States Letters Patents Nos. 4,884,-674 ("the '674 patent") and 5,216,613

("the '613 patent"), assessing damages at twenty-five million two hundred thousand United States dollars ($25,200,000.00).[9] Moreover, the jury found that Hyundai wilfully infringed the '674 and '613 patents. But Hyundai's patent misuse defense remained.

Hyundai best explains its patent misuse defense. It argues that the misuse:

is established by the automatic operation of the sales cap provision in the TI–Hyundai License Agreement, as interpreted by TI and the Court. Under that interpretation, all of Hyundai's worldwide sales of "ROYALTY BEARING PRODUCTS" necessarily fall into one or the other of two categories:

(1) products Hyundai made, used, or sold *within the scope* of TI's patents; and

(2) products Hyundai made, used, or sold *outside the scope* of TI's patents.

Under TI's prevailing interpretation of the license, the sum of Hyundai's sales in each category counted toward the sales cap and termination of Hyundai's license, and it would terminate when the sales cap resulting from total sales in both categories was reached. Because the sales cap is a fixed amount, however, the amounts in the two categories necessarily are inversely proportional. Accordingly, for every dollar sale of products *outside* the scope of TI's patents, Hyundai's license to sell one dollar of products *within* the scope of TI's patents was automatically withdrawn. TI thereby conditioned the *continuation* of Hyundai's license under TI's patents on Hyundai's *refraining* from selling products outside the scope of any of TI's patents... By making sales of products unprotected by any TI patents, Hyundai thus used up its license to make sales of products protected by TI's patents. If Hyundai sold products in the United States that it made with technology

---

9. Both of these patents—the '674 and '613 patents—are also known as the "Head Patents" named after their inventor, Texas Instruments scientist Claude D. Head, III.

Hyundai developed on its own, or acquired from a third party, that were not covered by TI's patents, those sales would nevertheless be counted toward the sales cap. Likewise, sales of products Hyundai made, used, and sold in countries in which TI held no applicable patents would also be counted toward the sales cap. Both kinds of sales would dollar-for-dollar diminish the extent of Hyundai's license thereby resulting in earlier termination... In counting worldwide sales of products both inside and outside the scope of TI's patents, the Court held that Hyundai's license terminated at least by May 1, 1998... But the sales cap would not have been reached at that time, and Hyundai's license would not have terminated at that time, if only the first category of sales—those within the scope of TI's U.S. patents—were counted... In counting only those worldwide sales of products potentially inside the scope of TI's patents, HEI's sales reached the sales cap as of February 9, 1999... Accordingly, Hyundai was penalized by early termination of its license for making sales of products completely outside the scope of TI's patents.

*Defendants' Proposed Findings of Fact and Conclusions of Law Regarding Patent Misuse ("Defendants' Proposed Findings")* 34–35 (internal numbering and citation omitted).

Not surprisingly, Texas Instruments disagrees. First, Texas Instruments argues that the sales-cap provision has been endorsed as legal and reasonable by the United States Supreme Court and the United States Court of Appeals for the Federal Circuit. Next, Texas Instruments argues there is no such thing as *per se* patent misuse due to tying after the Patent Misuse Reform Act of 1988, 35 U.S.C. § 271(d)(5) (1994); and, assuming *per se* patent misuse lives, it is inapplicable in this instance due to the admittedly unique nature of the sales-cap provision found

within Article 5.2(A)(ii) of the parties' License Agreement. Further, Texas Instruments argues that Hyundai failed to meet its burden to show a tying violation, much less a *per se violation*, because there are not two separate products to "tie," Hyundai was not actually coerced (or forced, or "conditioned") to refrain from selling "uncovered" products, and Hyundai failed to establish that Texas Instruments has market power in an appropriately defined relevant market. Finally, Texas Instruments argues that even if there were misuse in this case, it has been purged and Hyundai is equitably barred from asserting the equitable defense of patent misuse. *See Proposed Findings of Fact and Conclusions of Law of Plaintiff Texas Instruments Incorporated ("Plaintiff's Proposed Findings")* 2.

### 3. A Primer on Patent Portfolio Cross-License Agreements

█ In its February 4, 1999 *Memorandum and Opinion Order* [195], this Court briefly touched upon portfolio cross-license agreements in the semiconductor technology industry. Texas Instruments invited this Court to consider this extrinsic evidence in its interpretation of the parties' License Agreement—a contract both parties agreed was unambiguous. However, an exhaustive review of New York law (which governed the now-expired contract) revealed that, under New York contract law, extrinsic evidence could *not* be used by a court in its interpretation of an unambiguous contract. Accordingly, this Court sustained Hyundai's objection to Texas Instruments' proffered extrinsic evidence of cross-license agreements and the parties' prior negotiations. This Court explicitly refused to rely upon this evidence in its interpretation of the parties' unambiguous License Agreement.[10]

However, at the subsequent bench trial on Hyundai's patent misuse defense, the

---

**10.** The portfolio license discussion appears in the opinion strictly for background purposes. More than once this Court specifically noted that it would *not* rely upon this information in its interpretation of the parties' unambiguous License Agreement.

patent portfolio cross-license took center stage. Texas Instruments has over four thousand (4,000) patents and files between seven hundred (700) and eight hundred (800) patent applications each year. Just last year, Texas Instruments had six hundred and eleven (611) new patents issued. Hyundai has over one thousand two hundred (1,200) patents in the United States with a large number of pending applications. Large companies like Texas Instruments and Hyundai literally have thousands of patents around the world. With so many patents worldwide, it is quite possible for Texas Instruments and Hyundai to have multiple patents maturing and expiring every day.

A party to a license agreement covering only a single patent would have to determine before selling its product in a different country whether its sales would infringe any patents of the other party. This patent-specific determination would have to be done continually since new patents are constantly being issued. Moreover, these searches would also have to be done every time a party made a change in an existing product or came up with a new product. This patent-specific endeavor is extremely expensive and time-consuming. The product in question would have to be examined in detail and compared to the elements of the claims of the patent in question. Depending on the type of product, this product examination could take several months and costs tens of thousands of dollars—all to evaluate a single product against a single patent.

For parties with large semiconductor patent portfolios like Texas Instruments and Hyundai, what is the solution? Enter the patent portfolio cross-license agreement. The portfolio license is widely used in the semiconductor industry because it is almost impossible on a patent-by-patent, country-by-country, product-by-product basis to determine whether someone is using a company's patents in a given coun-try and provide protection for patents not yet issued. First, under a patent-specific license agreement, the parties have an extremely difficult time tracking the sales that should be included in the royalty base. This difficulty arises from the fact that the holder of a patent is entitled to receive royalties for items sold both directly and indirectly into the country where the patent exists. Parties to license agreements track indirect sales in order to receive full and fair value for their patents. If parties look only at direct sales, they are not receiving fair value for their patents. Tracking sales that come into a specific country is exceedingly difficult, for the party trying to track indirect sales has to know not only where the other party is selling its products, but also the identity of the purchasers in order to determine the likelihood that those products would come into a country where the other party has patents. Second, worldwide license rights are necessary in the semiconductor market because the semiconductor market is a worldwide market. Companies in the semiconductor market do not have the luxury of selling only in one country. Third, for parties with large patent portfolios like Texas Instruments and Hyundai, it is impossible to examine the entire portfolio on a patent-by-patent, country-by-country basis for all possible products. Finally, it is impossible to determine whether a specific product is "covered by" a patent without litigation. By using this expansive cross-license agreement mechanism—the portfolio license—mammoth companies in the semiconductor industry like Texas Instruments and Hyundai avoid the costly and inefficient endeavor of a patent-by-patent licensing scheme.

### 4. This License Agreement Was a Portfolio Cross–License Agreement[11]

One more time: the April 26, 1993 License Agreement between Texas Instru-

---

11. As this Court demonstrated in its February 4, 1999 *Memorandum and Opinion Order* [195] interpreting this License Agreement, specific provisions within the contract mili-tate against the patent-by-patent, product-by-product, country-by-country licensing interpretation proprosed by Hyundai's "TI Country Concept" interpretation.

ments and Hyundai was a *portfolio cross-license agreement.* Through the testimony of Texas Instruments' Senior Vice President and General Patent Counsel, Richard Donaldson, and through the testimony of its Vice President and Deputy General Patent Counsel, Frederick Telecky, Texas Instruments explained the history leading up to the signing of the License Agreement. This Court had the opportunity to evaluate Mr. Donaldson's testimony (subjected to cross-examination by Hyundai) and Mr. Telecky's live testimony (solicited by Hyundai); based upon its evaluation of this testimony, this Court finds that this testimony truthfully established the facts surrounding the negotiation and execution of the parties' License Agreement, as well as Texas Instruments' purposes for entering into that agreement. Incidentally, Hyundai presented no testimony at the misuse trial from either of the individuals responsible for negotiating that agreement on Hyundai's side—Mr. E.M. Chung and Mr. M.B. Chung.[12] Both Messrs. Chung were present in the courtroom throughout the patent-misuse bench trial.

The 1993 License Agreement was a portfolio cross-license agreement because Hyundai wanted "as broad as possible [a] license under [Texas Instruments'] patents." Hyundai's Mr. M.B. Chung specifically asked for a ten-year license that included Texas Instruments' entire portfolio, worldwide in scope, including all of Hyundai's products. Having just completed a license agreement with Samsung, Texas Instruments offered Hyundai a license with the same terms. Hyundai refused and requested Texas Instruments first demonstrate its patents would be of value to Hyundai. This is not a cheap endeavor. Indeed, Texas Instruments spent tens of thousands of dollars and several months complying with Hyundai's request. Due to the expense and time involved in this endeavor, Texas Instruments used only a very few of its patents as a proxy for the value of its entire portfolio.

After Hyundai started to bite and the cork started to bob, Texas Instruments offered Hyundai the same terms previously accepted by Samsung—a "running royalty" of nine (9) percent on sales of DRAMs ("dynamic random access memory" products) in the United States, and three (3) percent on sales of DRAMs in Japan. Texas Instruments proposed the "running royalty" agreement because it is the easiest way to accurately measure royalties. With a "running royalty," if sales go up, so does the total royalty payment. Conversely, if sales go down, so does the total royalty payment. Simply put, a running royalty is self-correcting.

Hyundai absolutely refused to discuss any running royalty; instead, Hyundai insisted on a fixed (or lump-sum) approach. In April 1991, and again in June 1991, Texas Instruments offered Hyundai a running-royalty rate of nine (9) percent on United States Dram sales, and three (3) percent on Japan DRAM sales. Why did Texas Instruments' running-royalty proposal focus on DRAM sales in the United States and Japan? At that time, Texas Instruments' negotiations with other semiconductor companies had established the reasonableness of Texas Instruments' proposed royalties, and because most DRAMs initially were sold into these two countries. Nonetheless, tracking sales into the United States and Japan remained an extremely difficult task because many companies were selling products into those countries F.O.B. ("free on board") at a foreign country. Further, tracking indirect sales requires pouring over licensee's books to see where and to whom products are being sold. There remains the task of contacting the licensee's customers to determine the quantity of DRAMs placed into a product delivered to the United States. All of this is virtually impossible; and the best a party can do is estimate the level of indirect sales.

Between April 1992 and September 1992, the parties underwent further nego-

12. No relation.

tiations. Not surprisingly, negotiations failed.

So, in September 1992, Texas Instruments filed a lawsuit against Hyundai in this very Court asserting Hyundai infringed a number of Texas Instruments' patents relating to the production of semiconductor memory chips. This 1992 lawsuit did not include the '674 and '613 patents (the Head patents), but rather accused Hyundai of infringing two Texas Instruments patents known as the "boosted word line" patents. Texas Instruments believed that the "boosted word line" patents would be difficult to design around. Texas Instruments was wrong—NEC did design around those patents. Hyundai maintained that these "boosted word line" patents were nonetheless obvious and not infringed.

After the filing of the September 1992 lawsuit, Texas Instruments and Hyundai held two face-to-face meetings in October 1992—one in San Francisco and the other in Phoenix. Texas Instruments' initial objective during these and other negotiations was to obtain a running royalty from Hyundai's sale of semiconductor products—the same running-royalty rate of nine (9) percent on United States Dram sales, and three (3) percent on Japan DRAM sales previously suggested. At the other end of the spectrum, Hyundai's initial objective during these and other negotiations was to obtain a fixed (or lump-sum) royalty.

In October of 1992, Texas Instruments and Hyundai reached an agreement that Hyundai would pay one hundred and nine million, nine hundred ninety-two thousand United States dollars ($109,992,000.00) [13] for a fixed ten (10) year license to Texas Instruments' patents to be paid over the life of the license. At Texas Instruments' request, these payments were structured as maximum annual royalties also known as "royalty caps." But a problem re-

mained. This lump sum was not self-correcting like the running royalty often used by Texas Instruments. That is, if Hyundai experienced extraordinary growth during the term of the license, the fixed sum would not take that unexpected growth (and thus sales) into account. So, shortly after the Phoenix meeting, Texas Instruments' Mr. Donaldson sent Mr. M.B. Chung a letter, dated October 26, 1992 which reiterated Texas Instruments' continuing concern that the lump-sum royalty advocated by Hyundai provided no protection to Texas Instruments in the event that Hyundai's sales grew at unexpected, extraordinary levels. Mr. Donaldson suggested that "one way of dealing" with this issue was to limit the *volume* of rights under the license.

Enter the sales-cap termination clause. For the License Agreement, Texas Instruments would accept one hundred and ten million United States dollars ($110,000,-000.00) for a certain *volume* of license rights. When Hyundai consumed those license rights, the License Agreement would automatically terminate. If Hyundai did not consume those license rights, the License Agreement would continue until December 31, 2000. In other words, this sales-cap termination clause was simply the converse of a running royalty. In a running royalty the term is fixed and the payment floats. Under this License Agreement and its sales-cap termination clause, the payment is fixed and the term floats. It was a rather clever solution.[14]

Mr. Donaldson's October 26, 1992 letter used two billion six hundred fifty-five million United States dollars ($2,655,000,-000.00) in worldwide sales as the volume of license rights that would be permitted under the License Agreement. Hyundai expected to increase its sales at an average of sixteen percent (16%) per year. Based on this sales-growth estimate, Hyundai

13. For simplicity, this Court will round this amount to one hundred ten million United States dollars ($110,000,000.00).

14. Nevertheless, settling a lawsuit by inventing a novel provision and inserting it into part of the settlement agreement is a rather bold strategy.

provided Texas Instruments with a projection of its worldwide sales for the last five (5) years of this agreement. Those numbers provided by Hyundai totaled two billion six hundred fifty-five million United States dollars ($2,655,000,000.00).

Hyundai rejected Mr. Donaldson's October 26, 1992 proposal. In response, Hyundai offered an additional five million United States dollars ($5,000,000.00) in royalties from 1997 through 2001 to address Texas Instruments' concerns about Hyundai's potential for extraordinary growth. This additional five million United States dollars ($5,000,000.00) in royalties would be forthcoming if Hyundai's growth rate from 1997 to 2001 exceeded a factor of 1.811.

1.811? Where did that come from? Mr. Chung's 1.811 growth factor was the result of an assumed Hyundai growth rate of sixteen percent (16%) per year. Sixteen percent (16%) annual growth from 1997 to 1998 would result in a one-year growth factor of 1.16; adding another sixteen percent (16%) annual growth from 1998 to 1999 would result in a two-year growth factor of 1.35; adding another sixteen percent (16%) annual growth from 1999 to 2000 would result in a three-year growth factor of 1.56; and (finally) adding another sixteen percent (16%) annual growth from 2000 to 2001 yields the four-year growth factor of 1.811.[15] All this math means this: the parties projected Hyundai to grow 81.1% over four years.

But what if Hyundai's growth exceeded that? Well, under Hyundai's proposal, the risk of Hyundai's extraordinary growth fell on Texas Instruments since Texas Instruments would be limited to the five million United States dollars ($5,000,000.00) should that risk become a reality. By shoving the risk of its own growth onto Texas Instruments, Hyundai, through its own extraordinary growth, would profit from the License Agreement at the expense of Texas Instruments. If Hyundai experienced extraordinary growth, Texas Instruments would be denied a fair return on its intellectual property. Indeed, if Texas Instruments had agreed to Hyundai's proposal and Hyundai had indeed experienced extraordinary growth, Texas Instruments' ability to negotiate licenses with other companies would become much more difficult. Companies often discover what others pay for licenses, which in turn sets a ceiling on what these companies would be willing to pay in the next round of negotiations. The next company sitting across the table from Texas Instruments would want a similar deal *at Texas Instruments' expense*. Simply put, the next guy would want too sweet of a deal from Texas Instruments. The net result would be to deprive Texas Instruments of a fair return on its intellectual property and its investment in research and development. For these and various other reasons, Texas Instruments rejected Hyundai's proposal.

From November 1992 to March 1993 both Texas Instruments and Hyundai struggled to negotiate a compromise. On March 8, 1993, Mr. Telecky of Texas Instruments wrote to Mr. M.B. Chung of Hyundai memorializing a telephone call between them. In that telephone call (as memorialized by the letter) Mr. Telecky told Mr. M.B. Chung and Hyundai that Texas Instruments would agree to a running royalty of eight and a half percent (8.5%) *after* the sales level of two billion six hundred fifty-five million United States dollars ($2,655,000,000.00) had been reached. A March 15, 1993 letter subsequently reflected this offer. Hyundai responded to Texas Instruments' suggestion by proposing that the License Agreement terminate (instead of providing for a running royalty) upon Hyundai's reaching either two billion six hundred fifty-five million United States dollars ($2,655,000,000.00) in worldwide sales of DRAMs times 1.1 or three billion five hundred forty-one million United States dollars ($3,541,000,000.00) in worldwide sales of integrated circuits ("IC") times 1.1. This Hyundai proposal is reflected

---

15. Subtracting out any Y2K perturbations.

in a March 25, 1993 letter from Mr. Telecky of Texas Instruments to Mr. M.B. Chung of Hyundai.

The two billion six hundred fifty-five million United States dollars ($2,655,000,000.00) and the three billion five hundred forty-one million United States dollars ($3,541,000,000.00) worldwide-sales figures were just different ways of measuring the same thing—the growth of Hyundai's sales. The integrated circuit (IC) measure is a broader category than just DRAMs. Where did the 1.1 come from?[16] The License Agreement reflected both numbers as being multiplied by 1.1 to make it clear that Hyundai was receiving an additional ten percent (10%) cushion in the number selected for the cap above Hyundai's projected sixteen percent (16%) annual growth rate. This was acceptable to Texas Instruments because it was tied to Mr. Donaldson's calculations of Hyundai's projected U.S. DRAM sales.

Hyundai eventually selected the worldwide semiconductor sales number (three billion five hundred forty-one million United States dollars ($3,541,000,000.00)) times 1.1 as the manner in which to measure the termination cap. After a considerable amount of labor, the parties gave birth to a healthy, sales-cap termination clause, Article 5.2(A)(ii)—the very clause currently in dispute.[17]

Article 5.2(A)(ii) contains the unique sales-cap termination clause. Hyundai argues that this unique sales-cap termination clause operates to "tie-out" Hyundai's sales, and, consequently, subject Texas Instruments to the defense of patent misuse. First, the sales-cap provision does not restrict Hyundai's sales. The obvious purpose of the provision was to satisfy Hyundai's desire for a definite and certain royalty obligation while also satisfying Texas Instruments' desire for protection from Hyundai's potential for ex-traordinary growth. Texas Instruments feared Hyundai's potential for extraordinary growth; running royalty was the common cure for such fear. Hyundai apparently had some aversion to the running royalty; instead, Hyundai desired a definite and more certain royalty obligation than the running royalty afforded. Thus, the parties worked together to create a unique solution: give Hyundai the lump sum it wanted but limit the life of the License Agreement to a certain amount of worldwide sales—Article 5.2(A)(ii). This provision picks up where the lack of a running royalty leaves off—it measures Hyundai's growth over the life of the agreement. If Hyundai indeed experiences extraordinary growth, Texas Instruments will not suffer under the License Agreement's fixed (lump) sum royalty since Article 5.2(A)(ii) will automatically terminate the License Agreement prior to Texas Instruments' failing to receive a fair return on its intellectual property.

Prior to the start of negotiations for a new license agreement, Hyundai never asserted any view of Article 5.2(A)(ii) that differed from Texas Instruments' view of this provision. Indeed, a March 25, 1993 Hyundai document reveals that Hyundai had exactly the same view as Texas Instruments. In that Hyundai memorandum from Mr. M.B. Chung to the Chairman of Hyundai, Mr. M.B. Chung told Hyundai's chairman that "our side" has proposed the termination cap and that Mr. M.B. Chung understood that, assuming sixteen percent (16%) growth by Hyundai, the License Agreement would expire in the first quarter of 1999. Indeed, in making that determination, Mr. M.B. Chung himself performed his calculation on Hyundai's worldwide sales of integrated circuits (IC).

---

**16.** In its February 4, 1999 *Memorandum and Opinion Order* [195] interpreting the parties' License Agreement, this Court could see no reason for the contract to actually say 1.1 times some number. NOW, with the full ad-mission of this extrinsic evidence, the reason for the added math becomes apparent.

**17.** Don't smoke those cigars just yet; the newborn is about to cause a ruckus.

Texas Instruments' fear of Hyundai's potential for "extraordinary growth" was soon realized.[18] Since negotiating the License Agreement, Hyundai manufactured so many more DRAMs than originally expected that Hyundai moved from being in the top twenty-five (25) world DRAM manufacturers before the agreement to number two (2) in the world by 1998.[19]

Article 5.2(A)(ii)—the unique sales-cap termination clause—does not penalize Hyundai. The cap merely reflects a compromise between the parties—a unique way to measure Hyundai's sales growth based on the administratively convenient measure of worldwide sales. Texas Instruments did not force or coerce Hyundai into entering into the License Agreement containing the termination cap.

## 5. Texas Instruments' Procurement of Patents in Foreign Countries

Texas Instruments literally has thousands of patents; indeed, many of these are in foreign countries. In addition to the United States, Europe, and Japan, Texas Instruments holds patents, inter alia, in Russia, Korea, Brazil, Israel, India, Mexico, New Zealand, Australia, Hong Kong, China, Singapore, Malaysia, Taiwan, and the Phillippines. However, Texas Instruments does not file patent applications in every country with a patent system because of the substantial cost of the exercise. Hyundai products are manufactured in Korea and the United States, where Texas Instruments has a large number of issued patents and published patent applications. These Texas Instruments patents, as defined in Article 1.3 of the License Agreement, potentially cover all Hyundai products. Hyundai products are also sold into countries throughout the world where Texas Instruments patents exist. These Texas Instruments patents also potentially cover Hyundai products.

The testimony of John C. Altmiller, Kyeong–Ran Lee, William R. Huber, and Lloyd L. Zickert, as well as the exhibits relating to the issue of Texas Instruments' coverage, establish that there are, at the very least, triable issues concerning whether there is coverage of all Hyundai products by Texas Instruments patents. Hyundai tried to show at trial that Texas Instruments had no Korean patents that covered Hyundai DRAMs. This Court finds that Hyundai failed to establish this as a matter of fact. Indeed, with respect to two of the three Korean Texas Instruments patents discussed by Ms. Lee, she specifically did not opine as to the absence of "coverage," but instead offered only her view that these patents were invalid. Texas Instruments' expert, Mr. Huber, offered testimony that Hyundai's products were covered by Taiwan and Singapore patents.

Texas Instruments, with the exception of the examination done by Mr. Huber of a few of its patents in Korea, has not looked at its Korean patents to determine whether they are applicable to products made by Hyundai. Nor has Texas Instruments done this with any of its other foreign or United States patents. Why not? Because the portfolio License Agreement obviates the need for such an examination during the life of the agreement. Such cross-license portfolio licenses do not require a patent-by-patent, country-by-country, product-by-product examination.

Article 7.9 of the License Agreement describes the operation of a portfolio license. During the life of the agreement, the parties are free to use whatever patents they desire anywhere in the world. There is no requirement to make daily determinations as to whether any new patents have issued—it's a package deal. The parties also agree that the fact a patent may be found to be invalid or nonenforceable will not have any effect on the agreement. Further, neither party can use a judicial finding of validity and infringement to argue for an increase in the royal-

---

18. Hyundai's aversion to a running royalty may, in fact, have been a concerted effort *by Hyundai* to protect *itself* from its own growth.

19. Since the signing of the License Agreement, Hyundai's sales grew along the lines of one thousand percent (1000%).

ty payments under the agreement. The net result of this portfolio License Agreement? Hyundai and Texas Instruments each enjoyed a worldwide license—worldwide freedom to manufacture without fear of infringement suits during the entire term of the License Agreement.[20]

Other provisions of the License Agreement bear out the portfolio nature of the parties' License Agreement. Article 9.1(c) of the License Agreement ensures that the royalty obligation does not depend on the number of patents a party chooses to use. A party can use all of the patents worldwide, or none, and the royalty obligation remains the same. Article 9.6 of the License Agreement provides that, once the parties enter into the agreement, neither has to file a patent application in any country of the world or even keep a patent in force in any given country of the world. Further, Article 9.4(a) of the License Agreement reflects the fact that neither party warrants that any patent is valid or infringed. Indeed, had Texas Instruments know about Hyundai's "TI Country Concept," Texas Instruments could have—and likely would have—filed more patent applications throughout the world,[21] and sought examination earlier where necessary in foreign countries.

Freedom and efficiency—that's what this portfolio License Agreement (whose duration was *potentially* measured by Article 5.2(A)(ii)) provided. Restriction and expense—that's what Hyundai continues to try to warp this portfolio License Agreement into. First, it was through Hyundai's tortured interpretation of Article 5.2(A)(ii) and the fifty-five (55) page License Agreement—with its "TI Country Concept" bolstered by its meandering, cross-referencing, and improper provision incorporation. Now, Hyundai re-urges this same bizarre concept to support a defense of patent misuse based upon the same interpretation of Article 5.2(A)(ii) and the fifty-five (55) page License Agree-

ment. Thanks to Hyundai, we are beating a (literally) dead horse—Article 5.2(A)(ii), the sales-cap termination clause.

## II. CONCLUSIONS OF LAW

### 1. The Life and Death of *Per Se* Patent Misuse Due to Tying

"Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which 'requires that the alleged infringer show that the patentee has impermissibly broadened the "physical or temporal scope" of the patent grant with anticompetitive effect.'" *Virginia Panel Corp. v. Mac Panel Co.*, 133 F.3d 860 (Fed.Cir.1997), quoting *Windsurfing Int'l v. AMF*, 782 F.2d 995, 1001 (Fed.Cir.1986), and quoting *Blonder–Tongue Lab. v. University of Ill. Found.*, 402 U.S. 313, 343, 91 S.Ct. 1434, 1450, 28 L.Ed.2d 788 (1971). *See also Morton Salt Co. v. G.S. Supplier Co.*, 314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *Senza–Gel Corp. v. Seiffhart*, 803 F.2d 661, 668 & n. 10 (Fed.Cir.1986). "All that a successful defense of patent misuse means is that a court of equity will not lend its support to enforcement of a misuser's patent." *Senza–Gel Corp.*, 803 F.2d at 668. Patent misuse? Where did that come from? Apparently, it developed, in part, from salt tablets.

In 1942 the United States Supreme Court faced an attempt by G.S. Suppiger to make "use of its patent monopoly to restrain competition in the marketing of unpatented articles, salt tablets, for use with the patented machines, and is aiding in the creation of a limited monopoly in the tablets not within that granted by the patent," *Morton Salt Co. v. G.S. Suppiger Co.* 314 U.S. 488, 491, 62 S.Ct. 402, 404, 86 L.Ed. 363 (1942). That is, the patentee G.S. Suppiger permitted the licensee to use with Suppiger's patented, salt-tablet-dispensing machines *only those salt tablets sold by the patentee.* Don't bother passing

---

**20.** Notwithstanding any strained interpretations of the portfolio License Agreement's language.

**21.** Apparently, some countries merely require a small fee and a little paperwork to register patents within their borders.

**908**

us the Suppiger salt, opined the Supreme Court as it affirmed the district court's dismissal of Suppiger's complaint "for want of equity:"

> Where the patent is used as a means of restraining competition with the patentee's sale of an unpatented product, the successful prosecution of an infringement suit even against one who is not a competitor in such sale is a powerful aid to the maintenance of the attempted monopoly of the unpatented article, and is thus a contributing factor in thwarting the public policy underlying the grant of the patent ... *Equity may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement, and should do so at least until it is made to appear that the improper practice has been abandoned and that the consequences of the misuse of the patent have been dissipated.*

*Morton Salt,* 314 U.S. at 493, 62 S.Ct. at 405, 86 L.Ed. 363 (emphasis added) (internal text and citation omitted). That is, the Supreme Court would not maintain an infringement suit by Suppiger since it was engaged in patent misuse.

■ But what about *per se* patent misuse? Where did that come from? "The rule was first enunciated in *International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947), and has been endorsed by this Court many times since." *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 9–10, 104 S.Ct. 1551, 1556–57, 80 L.Ed.2d 2 (citing *United States Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 619–621, 97 S.Ct. 861, 867–68, 51 L.Ed.2d 80 (1977); *Fortner Enterprises v. United States Steel Corp.,* 394 U.S. 495, 498–499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969); *White Motor Co. v. United States,* 372 U.S. 253, 262 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963);

*Brown Shoe Co. v. United States,* 370 U.S. 294, 330, 82 S.Ct. 1502, 1526–27, 8 L.Ed.2d 510 (1962); *United States v. Loew's Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Black v. Magnolia Liquor Co.,* 355 U.S. 24, 25, 78 S.Ct. 106, 108, 2 L.Ed.2d 5 (1957); *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 608–609, 73 S.Ct. 872, 880–81, 97 L.Ed. 1277 (1953); *Standard Oil Co. v. United States,* 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949)). More important, does *per se* patent misuse still live? Texas Instruments says it is dead—laid to rest by Congress' passage of the 1988 Patent Misuse Act:

> (d) No patent owner otherwise entitled to relief for infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following:
>
> ...(5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

35 U.S.C. § 271(d)(5). The district court for the Southern District of Illinois:

> [T]he 1988 Patent Misuse Reform Act has placed limitations on the finding of patent misuse in tying arrangements. *The Act eliminates per se findings of patent misuse in such situations.* When the Act governs, a finding of patent misuse is prohibited unless the patentee is shown to have market power in the relevant market for the patent involved in the tying arrangement.[22]

**22.** The *In re Recombinant* Court faced an alleged "tie-out" form of patent misuse—the type of patent misuse Hyundai is asserting against Texas Instruments. After examining the case law of patent misuse and the statutory history of the 1988 Patent Misuse Reform Act, that Court specifically refused Lily's argument that § 271(d)(5) was limited to "tie-ins." What is the difference between a "tie-in" and a the "tie-out?" "Through the years, courts have found per se patent misuse in varying forms of tying arrangements. In

*In re Recombinant DNA Technology Patent and Contract Litigation,* 850 F.Supp. 769, 775 (S.D.Ind.1994) (emphasis added). Texas Instruments posits this 1994 decision is proof positive that *per se* patent misuse passed away post–1988 Patent Misuse Reform Act.

Not surprisingly, Hyundai disagrees. Hyundai cites *Virginia Panel Corp. v. Mac Panel Co.* for the proposition that *per se* patent misuse persists. In *Virginia Panel* the Federal Circuit explained:

> The courts have identified certain specific practices as constituting per se patent misuse, including so-called "tying" arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good ... and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties... Congress, however, has established that other specific practices may not support a finding of patent misuse... A 1988 amendment to § 271(d) provides that, inter alia, in the absence of market power, even a tying arrangement does not constitute patent misuse.

> When a practice alleged to constitute patent misuse is neither per se patent misuse nor specifically excluded from a misuse analysis by § 271(d), a court must determine if that practice is "reasonably within the patent grant", i.e., that it relates to subject matter within the scope of the patent claims... If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse... If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accor-

dance with the "rule of reason." Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."

*Virginia Panel Corp.,* 133 F.3d at 869. This Court does not read *Virginia Panel* for the proposition that Congress failed to eliminate *per se* patent misuse *after* passage of the 1988 Patent Misuse Reform Act. It would appear that counsel for Hyundai, Kenneth M. Frankel, initially agreed that the 1988 Patent Misuse Reform Act eliminated holdings of *per se* patent misuse due to tying:

> Subparts (4) and (5) of § 271(d) were enacted in 1988. ***The purpose of subpart (5) regarding tying was to eliminate for patents court holdings of per se misuse due to tying, e.g. Motion Picture Patents and Morton Salt.*** After the effective date of this provision (November 19, 1988), patent misuse cannot be found for tying unless the patent owner has market power in the relevant market for the patented product or process, analyzed in the same way market power is determined for antitrust tying cases. Even if such power is found, however, misuse apparently will not exist unless the tying restriction is on balance unreasonably anticompetitive, using standard antitrust rule of reason analysis. In explaining the misuse provisions just before the Senate passed the legislation, Senator DeConcini said that even if market power is shown, "[t]he patent owner may still argue that any

some cases, the patentee is conditioning the license of his patent on the licensee agreeing to use some specific unpatented product [a "tie-in"]...In other cases, the patentee is conditioning the license of his patent on the licensee agreeing not to use the products or devices of a competitor [a "tie-out"]." *In re Recombinant,* 850 F.Supp. at 776; *see also Kenneth M. Frankel, Problems in Licensing*

*Intellectual Property for Software and Computer Technology. Important Antitrust and Misuse Considerations,* 479 PLI/Pat 733, 776–77 (1997). The *In re Recombinant* Court could "[ ]not find an instance in which a court has indicated that the two tying arrangements should be treated differently." *In re Recombinant,* 850 F.Supp. at 776. Ditto.

substantially anticompetitive impact of the tie-in is outweigh by benefits of the arrangement, including both procompetitive benefits and other potential business justifications". This will constitute the heart of this misuse rule-of-reason analysis.

Kenneth M. Frankel, *Problems in Licensing Intellectual Property for Software and Computer Technology. Important Antitrust and Misuse Considerations*, 479 PLI/Pat 733, 776–77 (1997) (emphasis added) (hereinafter Frankel, *Problems*); *see also* Richard Calkins, *Patent Law: The Impact of the 1988 Patent Misuse Reform Act and Noerr–Pennington Doctrine on Misuse Defense and Antitrust Counterclaims*, 38 Drake L.Rev. 175, 197 (1988/1989) ("Congress sought to eliminate any vestiges of *per se* or automatic inference of patent misuse from tying practices."). It is quite interesting that both the Illinois District Court and Mr. Frankel seized upon similar legislative history—particularly, the remarks of Senator De-Concini—for sounding the death knell of *per se* patent misuse due to tying: "For example, the Congressional Record of the Senate regarding the Act indicates that Congress' intention was to deal with '. . . a small piece of the patent misuse problem—tying arrangements—and leaves the rest for us to address in the future.'" *In re Recombinant*, 850 F.Supp. at 776 (quoting Senator DeConcini). Mr. Frankel argues that his position was prior to *Virginia Panel* and, consequently, over-ruled by that Federal Circuit decision's alleged embrace of *per se* patent misuse due to tying. "Before the 1988 amendments, if you had a patent which was extended beyond the scope in a tying-type arrangement, you would have misuse . . . I wrote that article and I gave that talk at the PLA program in New York, I think it was, in May of 1997. And *Virginia Panel*, Your Honor, came down in December of 1997." *April 6, 1999 Trial Transcript* pp. 477–78. Both Mr. Frankel (in Court) and Hyundai (through its motions and briefs) focus on an excerpt of *Virginia Panel* wherein they argue the Federal Circuit breathes life into *per se* patent misuse due to tying:

> The courts have identified certain specific practices as constituting per se patent misuse, including so-called "tying" arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good . . . A 1988 amendment to § 271(d) provides that, inter alia, in the absence of market power, even a tying arrangement does not constitute patent misuse.

*Virginia Panel Corp.*, 133 F.3d at 869. First, this Court specifically notes that the Federal Circuit merely recognized that the courts have *historically* identified tying practices as constituting *per se* patent misuse—something the Supreme Court itself has done before: "It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'" *Jefferson Parish*, 466 U.S. at 9, 104 S.Ct. at 1556, 80 L.Ed.2d 2 Moreover, in its motion for summary judgment, Hyundai's excerpted portion of *Virginia Panel* omits an internal citation: "The Courts have identified certain specific practices as constituting per se patent misuse, including so-called 'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, **see e.g., Morton Salt Co., 314 U.S. at 491, 62 S.Ct. at 404, 86 L.Ed. 363, 52 USPQ 30, 33 . . .**" *Virginia Panel*, 133 F.3d at 869 (emphasis added to show omitted citation). As already noted, this 1941 case is one of the seminal cases of *per se* patent misuse. A little math reveals that this case was decided before the 1988 Patent Misuse Reform Act. Moreover, § 271(d)(5) specifically notes that patent misuse-tying analysis is to be considered "in view of the circumstances," strongly suggesting that rule-of-reason analysis—not *per se* analysis—applies. According to the Supreme Court, when conducting a rule-of-reason analysis, "the factfinder weighs *all of the circumstances of a case* in deciding whether a

restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (emphasis added); *accord National Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 690, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Indeed, the legislative history of the 1988 Patent Misuse Reform Act supports the death of *per se* patent misuse due to tying: "The relevant legislative history consists of formal statements made on the House and Senate floors by Senator DeConcini, chairman of the Subcommittee on Patents, Copyrights and Trademarks, Senator Leahy, chairman of the Subcommittee on Technology and the Law, and Representative Kastenmeier, chairman of the Subcommittee on Courts, Civil Liberties and the Administration of Justice." 6 *Chisum on Patents* § 19.04[1], at 19–295 (1997). "The 'tying' provision was extensively discussed in both the House and Senate." *Id.*

In the House of Representatives, Rep. Kastenmeier discussed the intent to eliminate *per se* rules due to tying: "The underlying principle being advanced by this proposal is the elimination of any vestiges of a per se or automatic inference of patent misuse from certain tying practices." 134 Cong.Rec. H10648 (daily ed. Oct. 20, 1988) (statement of Rep. Kastenmeier). Rep. Kastenmeier further remarked that Congress's decision to require a specific assessment of market power "in view of the circumstances" was "used in this context in order to permit the courts to reasonably assess the potential for anticompetitive effect of a particular practice." *Id.* Congress intended for the courts to evaluate business justifications for certain licensing practices (like tying practices) under a rule-of-reason analysis. In words strikingly *on point for* this case. Rep. Kastenmeier stated:

> It is also our intention to avoid the use of inflexible rules once a court has found that market power exists. There may be circumstances in which there is market power and a tie-in, but where a finding of misuse would be inappropri-

ate. One example would be where the patent owner has a business justification for the licensing practice. In real world situations where the only practical way to meter output is to tie the sale of a patented product to the sale of another separate product, then such a practice would be legitimate, unless such a practice—on balance—has a generally anti-competitive effect.

*Id.* at H10648–49 (statement of Rep. Kastenmeier).

In the Senate, Senators DeConcini and Leahy made clear that *per se* rules due to tying were being abolished by Section 271(d)(5), and that showings of unreasonableness and anticompetitive effect would be required before misuse based on tying would be found. Senator DeConcini stated:

> First, this bill moves away from a *per se* approach used in the past by the courts in applying patent misuse principles to tying arrangements. While not mandating an antitrust test, the legislation nonetheless imposes a rule-of-reason type analysis before a court can conclude that a tie-in is misuse.
>
> Second, the bill establishes a market power threshold test to precede any misuse finding involving tying. If the alleged infringer cannot prove that the patent owner has market power in the relevant market for the patent or patented produc[t], the tying product, then there can be no patent misuse by virtue of the tie-in, and that is the end of the inquiry.
>
> Third, *even if the defendant in a patent infringement action proves that the patent owner has market power,* this does *not* automatically mean that the court must find that the patent owner has misused the patent. The patent owner may still argue that any substantially anticompetitive impact of the tie-in is outweighed by the benefits of the arrangement, including both procompetitive benefits and other potential business justifications. *This will constitute*

*the heart of the misuse rule-of-reason analysis.*

134 Cong.Rec. S 17147 (daily ed. Oct. 21, 1988) (statement of Sen. DeConcini) (emphasis added).

Senator Leahy joined Senator DeConcini:

> This legislation makes absolutely clear that the misuse doctrine must not be applied to tying arrangements in per se or inflexible manner, without regard to an evaluation of the effects of the practice in the marketplace and the business justifications for the tie-in.... *[T]he statute's use of the words "in view of the circumstances" means that after the alleged infringer has proven that the patent owner has market power, a balancing test of circumstances, including business justification, must be employed.* Courts will have to go through the process of evaluating the patent owner's market power ... and must consider the availability of substitutes, and the existence of any business justifications or other benefits, before concluding that a patent has been misused.

134 Cong.Rec. S 17147–48 (daily ed. Oct. 21, 1988) (statement of Sen. Leahy) (emphasis added). No contrary statement appears in the legislative history of Section 271(d)(5). Although there may still be *per se* patent misuse lurking out there somewhere, it does not exist for patent misuse due to tying. This Court holds that the Patent Misuse Reform Act of 1988 removed the doctrine of *per se* patent misuse due to tying.

Assuming *arguendo* that *per se* patent misuse somehow survived the 1988 Patent Misuse Reform Act (and it did not), it is of no consequence in this particular case. First, "[i]t is only after considerable experience with certain business relationships

that courts classify them as per se violations..." *United States v. Topco Associates,* 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *see also Broadcast Music v. Columbia Broadcasting Sys.,* 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979) ("The scrutiny occasionally required must not merely subsume the burdensome analysis required under the rule of reason ... or else we should apply the rule of reason from the start. *That is why the per se rule is not employed until after considerable experience with the type of challenged restraint.*") (emphasis added); *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) ("*Per se* treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.' "); *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). Both parties admit that the Article 5.2(a)(ii)—the "sales-cap" termination clause—is a unique provision. When queried by the Court whether either party knew of any misuse case that involved an arrangement identical or similar to the sales-cap provision at issue here, counsel for both Texas Instruments and Hyundai candidly admitted that they were aware of no such case.[23] Moreover, the License Agreement and its unique sales-cap provision was the result of a settlement. Indeed, the parties entered into the April 26, 1993 License Agreement to settle litigation pending in this very court. In *Speed Shore Corp. v. Woudenberg Enterprises* the Ninth Circuit faced a similar situation. 605 F.2d 469 (9th Cir.1979). There, defendants had previously admitted manufacturing shoring devices that infringed the plaintiff's patent. The parties negotiated a

---

**23.** Before (rather extensive) summation, this Court specifically inquired as to the sales-cap clause's uniqueness:

> The Court: "Are there any cases—has this case ever been tried before with the facts [sales-cap provision] ... that are before it?... I can't find any case that is identical to this..."

> Mr. Beck [for Hyundai]: "Your Honor, the results of your research are consistent with the results of our research."
> Mr. Roth [for Texas Instruments]: "... There is no case specifically on point, not a white horse case."

*April 6, 1999 Trial Transcript,* p. 476.

settlement and entered into a license agreement. Later, the defendants argued that the negotiated license agreement fostered patent misuse:

It is well recognized that settlement agreements are judicially favored as a matter of sound public policy. Settlement agreements conserve judicial time and limit expensive litigation. The defendants seem to argue, however, that the equitable doctrine of patent misuse prevails over the policy of favoring the settlement of disputes. In this case we disagree... We feel that to allow a subversion of the deeply-instilled policy of settlement of disputes by applying the doctrine of inequitable conduct, in the manner contended for by the defendants, would have the effect of stripping good-faith settlements of any meaning. We do not believe that the doctrine of inequitable conduct was intended to extend so far.

*Speed Shore*, 605 F.2d at 473–74. Similarly, Texas Instruments and Hyundai negotiated a settlement and entered into the License Agreement—including the sales-cap provision that Hyundai now contends is an improper tie-out. Both parties literally invented the sales-cap provision as a compromise between Texas Instruments' desire for a running royalty and Hyundai's insistence on a lump sum. In this very Court Hyundai settled pending litigation by helping invent a unique sales-cap provision and entering the fifty-five (55) page License Agreement. Now, Hyundai wants to void that License Agreement with the very same provision—a provision Hyundai helped invent. That is, Hyundai wants this Court to exercise its *equitable* power to void a provision Hyundai helped create. Finally, and most important, this Court finds that even if *per se* patent misuse were still alive (and it is not), Hyundai has failed to establish facts necessary to support even that defunct doctrine.

## 2. Analysis

█ As Hyundai points out in its brief, "[t]o establish [a now defunct] *per se* misuse through a tie-out, Hyundai must show

that: (1) two separable items are involved in the tying arrangement; (2) the tied item is capable of substantial non-infringing use; and (3) the two items actually are tied... Finally, Hyundai must show (4) that TI has market power in a relevant market encompassing the tying item." *Hyundai's (1) Memorandum in Opposition to TI's Motion for Summary Judgment and (2) Memorandum in Support of its Cross–Motion for Partial Summary Judgment Regarding Patent Misuse Defense "Hyundai's Memorandum"* 15 (internal citation omitted).

### A. Hyundai's "Separable Items" Should Be "Separate Products"—And There Are None

One of the fundamental requirements of a tying violation is that there be two *separate products* to tie together. *See e.g., Jefferson Parish Hosp. Dist.*, 466 U.S. at 18, 104 S.Ct. 1551; *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 498–99, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Crossland v. Canteen*, 711 F.2d, 714 722 (5th Cir.1983). 35 U.S.C. § 271(d)(5) (discussed in detail, *infra* ) also requires a showing that a "separate product" is tied to the tying product.

Hyundai argues that the separate products (or "separable items" to borrow Hyundai's term) are: 1) "the right to make, use or sell products which are covered by TI's portfolio, patent portfolio"; and 2) "the unfettered right of Hyundai to make, use or sell those products which are entirely outside the scope of TI's patents." Hyundai does not contend that identifiably separate products are tied under the License Agreement. Hyundai admits that no customer ever walked into Hyundai's shop and asked to buy a "covered DRAM" as opposed to an "uncovered DRAM." DRAMs are DRAMs. Hyundai's theory of "separateness" or "separability" attempts to artificially separate *the same product* into two different "categories" based on legal status—specifically, whether a Texas Instruments patent "covers" the product in

the place where the product is initially sold.

This Court holds that Hyundai has failed to show that separate products are tied by the License Agreement. First, Hyundai's alleged tie is not a tie of *products,* but, rather, an alleged tie of *"rights"* to "make, use or sell products." Second, as this Court noted in its February 4, 1999 *Memorandum and Opinion Order* [195] interpreting the parties' License Agreement, this "separateness" is inherently incapable of determination. In that opinion, Hyundai urged "royalty bearing products" were limited to products "covered by" a valid Texas Instruments patent. Rejecting Hyundai's argument, this Court noted:

> The only way the parties could establish 'royalty bearing products' to determine royalties would be through product-by-product, patent-by-patent, country-by-country litigation. In order to reach the sales cap provision and reap the rewards of its royalties, Texas Instruments would literally have to file (and win) a patent-infringement lawsuit for each product for each country where Hyundai is selling that particular Texas Instruments product.

*Texas Instruments, Inc. v. Hyundai Electronics,* 42 F.Supp.2d 660 (E.D.Tex.1999). Hyundai's artificial division of products into "covered" and "uncovered" categories overlooks the critical fact that, in the real world, the "covered" or "uncovered" legal status of a Hyundai product is indeterminate absent patent-by-patent, product-by-product, country-by-country litigation.[24] This is precisely why mammoth companies in the semiconductor industry like Texas Instruments and Hyundai enter into portfolio cross-licenses like the License Agreement at issue here.

Hyundai argues that *Senza–Gel Corp. v. Seiffhart* supports its artificial division of Hyundai products into "separable" (but not actually separate) "covered" and "uncovered" categories. 803 F.2d 661 (Fed. Cir.1986). It does not.

In *Senza–Gel,* the district court certified an interlocutory appeal to the Federal Circuit to test the correctness of its formulation of the elements of a patent-misuse tying arrangement. *See id.* at 664. Yet, as the Federal Circuit noted, "neither party addresse[d][the] certified question ... in th[eir] briefs." *Id.* at 665. In light of this "incredible" oversight, the Federal Circuit "caution[ed] that [it][was] not ... explicating all of the analytical parameters that may be applicable to patent misuse questions in future cases," but "in light of the record before it" found "no impropriety in the district court's [analysis]." *Id.* Thus, the Federal Circuit hardly gave precedential endorsement to the term "separable" in its opinion. Moreover, looking at the facts of *Senza–Gel,* it is clear that *separate products,* not merely "separable items," were involved. Senza–Gel was alleged to have conditioned licenses to its patented ham processing process on the lease of a ham processing machine. *See id.* at 663. While *Senza–Gel* does use the term "separable" when describing the district court's definition of the elements of a patent misuse tying arrangement, it is clear that the Patent Misuse Reform Act of 1988 established "separate products," not "separable items," as the appropriate benchmark. *See* 35 U.S.C. § 271(d)(5) ("No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having ... (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a *separate product....* ") (emphasis added). That is undoubtedly why

---

24. Indeed, the only Hyundai products that could possibly be considered as those "covered" by *valid* Texas Instruments patents would be those involved in this lawsuit—the '674 and '613 "Head" patents. But, under Hyundai's "TI Country Concept" interpretation, as this Court writes this opinion even these products are indeterminate as Hyundai's patent misuse defense prevents entry of judgment.

Hyundai's counsel, and other commentators, view *Senza–Gel* as having limited, if any, significance after the Patent Misuse Reform Act of 1988. *See* Kenneth M. Frankel, *Problems in Licensing Intellectual Property for Software and Computer Technology. Important Antitrust and Misuse Considerations*, 479 PLI/Pat 733, 777 (1997); Joel R. Bennett, *Patent Misuse: Must an Alleged Infringer Prove an Antitrust Violation?*, 17 AIPLA Q.J. 1, 2 (1989) (Section 271(d)(5) "in effect overturns the Court of Appeals for the Federal Circuit's (CAFC) tie-in decision in *Senza–Gel Corporation v. Seiffhart*.").

The parties' inability to distinguish "covered" and "uncovered" products also distinguishes this case from two others heavily relied upon by Hyundai—*United Shoe Machinery Corporation v. United States*, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922), and *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Both of these cases involved the tying of two clearly separate products. In *United Shoe*, a company leased shoe manufacturing equipment to shoe manufacturers and included in the lease a term that permitted United Shoe to cancel the lease immediately if the manufacturer, *inter alia*, used any other company's shoe-making machinery or purchasing manufacturing supplies from any other company. 258 U.S. at 456–57, 42 S.Ct. 363. Similarly, in the already discussed *Morton Salt* case, a company conditioned leases of a patented canning machine on the lessee's agreement to purchase unpatented salt tablets for use in the machine exclusively from the lessor. 314 U.S. at 490–91, 62 S.Ct. 402. Unlike the indeterminate "products" covered by the License Agreement, the "tying" and "tied" products were readily identifiable in these cases. In addition, in both *United Shoe* and *Morton Salt*, the licenses terminated immediately upon occurrence of the "condition"; here, by contrast, no such conditioning exists, since the termination cap is simply a metric for measuring the value of the license. Finally, and also in contrast to *United Shoe*

and *Morton Salt*, the License Agreement does not restrict Hyundai from purchasing anything from a Texas Instruments competitor. In the relevant market proposed by Hyundai, Texas Instruments "competitors" are other firms who possess intellectual property rights "useful for the manufacture of DRAMs in the United States." The License Agreement creates absolutely no obstacle to Hyundai's ability to license intellectual property rights from these firms.

In truth, when Hyundai signed the License Agreement, it purchased one "product"—a unitary covenant that Texas Instruments would not sue Hyundai over any integrated circuit (IC), anywhere, during the term of the agreement. Under the License Agreement, Hyundai enjoyed complete freedom of operation. The License Agreement relieved Hyundai from the onerous burden of constantly monitoring whether Texas Instruments had obtained new patents (and in what countries), whether existing products infringed on existing patents or on those new patents, and whether newly developed products infringed any Texas Instruments patent. As this Court noted in its February 4, 1999 *Memorandum and Opinion Order* [195] interpreting the License Agreement, this result could not have been reached through a patent-by-patent licensing scheme, even if the patent-by-patent license encompassed all of Texas Instruments' extant patents at the time the agreement was signed. Nor could it have been reached by limiting the license to products that were "covered" when sold, since that would have left unlicensed the many Hyundai products that, although "uncovered" by a Texas Instruments patent when sold, eventually made their way into a country where Texas Instruments had patents. The License Agreement provided a single protection to all Hyundai integrated circuits—it provided every integrated circuit manufactured by Hyundai with the freedom to be moved anywhere in the world with full protection from Texas Instruments claims of infringement. With the License Agreement, just

as with the blanket license upheld by the Supreme Court in *Broadcast Music Inc. v. Columbia Broadcasting Systems, Inc.,* "the whole is truly greater than the sum of its parts; [the License Agreement] is, to some extent, a different product." 441 U.S. 1, 21–22, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

### B. Texas Instruments Does Not Have Market Power in a Relevant Market

■ Hyundai also fails to establish that Texas Instruments has market power in a relevant market. Market power requires that Hyundai show that Texas Instruments has the power "to force [Hyundai] to do something it would not do in a competitive market." *Jefferson Parish Hosp. Dist.,* 466 U.S. at 14, 104 S.Ct. 1551. At trial, Hyundai's economic expert, Mr. Weinstein, testified that the relevant market in which to test Texas Instruments' power was the market for "rights to technology useful in the manufacture of DRAMs in or for sale in the United States." Texas Instruments' expert, Mr. David Teece, testified he was "not sure" that there is "such a market." Hyundai's allegation of market power is simply that the United States government has granted Texas Instruments the legitimate right to exclude others from Texas Instruments' patented technology. But antitrust law dictates this is not impermissible market power. *See, e.g., TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1025 (10th Cir. 1992); *CCPI Inc. v. American Premier, Inc.,* 967 F.Supp. 813, 818 (D.Del.1997); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162, 172 (S.D.N.Y.1995); *Klo–Zik Co. v. General Motors Corp.,* 677 F.Supp. 499, 504 (E.D.Tex.1987).

Hyundai relies heavily on the fact that Texas Instruments has licensed its portfolio of patents related to the manufacture of DRAMs, including the '674 and '613 "Head" patents, to most, if not all, of the major manufacturers throughout the world, including Hyundai. Moreover, argues Hyundai, Texas Instruments considers the '674 and '613 "Head" patents "very important" to the "manufacturing of DRAMs in the United States." Indeed, Texas Instruments' own witnesses testified that the '674 and '613 "Head" patents are "key process patents" and "the lock to the door" with respect to the manufacturing of semiconductor DRAMs. So what? Once again, anti-trust law holds this not impermissible market power.[25]

Moreover, Hyundai's representative, Mr. M.B. Chung, and economic expert, Mr. Roy Weinstein, urged that Texas Instruments' market power was measured by whether or not Texas Instruments has "blocking patents." Blocking patents? A blocking patent, in the case of a DRAM, would be a patent without which a DRAM could not be made. While Hyundai presented testimony that Texas Instruments believes the '674 and '613 "Head" patents to be very important for the manufacture of DRAMs, Hyundai itself specifically testified it does not believe Texas Instruments has any blocking patents. Indeed, the Head patents were not adjudicated during the life of the License Agreement, as Hyundai's expert Roy Weinstein admitted on cross-examination. Mr. Weinstein retreated to describing Texas Instruments' boosted word line patents as blocking patents upon which Hyundai relied, but there is no proof in the record that these boosted word line patents are "blocking patents." In fact, there is testimony to the contrary.

---

**25.** Here's the problem: Hyundai built a one billion three hundred million dollar ($1,300,-000,000.00) semiconductor manufacturing facility in Eugene, Oregon—*a facility that uses Texas Instruments '674 and '613 "Head" patents to manufacture semiconductor products.* Hyundai argues that "without a license from TI, Hyundai had no alternative to the Head

patents and would have to shut down its $1.3 billion fabrication facility in Eugene, Oregon". *Hyundai's Memorandum Brief* 25. Hyundai tries to use this as an example of market power. It isn't. It merely represents a calculated risk voluntarily taken by Hyundai—*not market power forced upon Hyundai by Texas Instruments.*

Moreover, Hyundai has failed to show coercion. If, as Hyundai admitted, it did not believe Texas Instruments had blocking patents, how could it have been coerced? [26]

## C. Equity Does Not Lie With Hyundai

■ Patent misuse is an equitable defense. *See, e.g., C.R. Bard v. M3 Systems,* 157 F.3d 1340, 1372 (Fed.Cir.1998); *B. Braun Med. v. Abbott Laboratories,* 124 F.3d 1419, 1427 (Fed.Cir.1997). As such, Hyundai must be equitably entitled to invoke that defense. " 'It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands.' " *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 244, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (quoting *Story's Equity Jurisprudence* § 98 (14th ed.)); *accord, e.g., New York Football Giants, Inc. v. Los Angeles Chargers Football Club, Inc.,* 291 F.2d 471, 473 (5th Cir. 1961) (endorsing the "age-old, but sometimes overlooked, doctrine that 'he who comes into equity must come with clean hands' "); *Smith v. United States,* 130 Ct.Cl. 222, 126 F.Supp. 433, 437 (1954) ("[O]ne of the oldest principles of equity jurisprudence is that he who comes into a court of equity must come with clean hands.").

■ Hyundai comes to this Court with unclean hands. Let's recap what Hyundai has done thus far. First, Hyundai approaches Texas Instruments in order to enter into a patent portfolio cross-license agreement. Texas Instruments, fearful of Hyundai's potential for extraordinary growth, suggests the self-correcting, oft-used "running royalty" which would accurately track Hyundai's sales and fairly compensate Texas Instruments for its intellectual property. Hyundai refuses to

entertain the notion of a running royalty. Rather, Hyundai insists on paying a fixed (or lump) sum. If the parties use Texas Instruments' running royalty suggestion, the risk and expense of Hyundai's extraordinary growth falls on Hyundai, which must pay royalties on its unexpected, increased sales. Conversely, if the parties use Hyundai's fixed (or lump) sum suggestion, the risk and expense of Hyundai's extraordinary growth falls on Texas Instruments, which must sacrifice a fair return on its intellectual property as Hyundai's sales shoot through the roof and overshadows the fixed (or lump) sum.

So what did the parties do? What they should have done—they negotiated a compromise. Texas Instruments suggests a type of sales-cap termination clause that would measure the life of the License Agreement by the volume of Hyundai's sales. *In response to this suggestion Hyundai voluntarily helped create and refine a "sales-cap termination clause"—Article 5.2(A)(ii), the very sales-cap termination clause currently accused of generating patent misuse.* This Court finds, as a matter of fact, that Hyundai *at the very least* helped draft and create the very sales-cap termination clause it now insists amounts to patent misuse. Hyundai signed the License Agreement with the sales-cap termination clause and Texas Instruments dismissed its pending lawsuit against Hyundai. All was well until ...

On January 20, 1998—roughly five years after the contract was signed—Hyundai injected a never before mentioned interpretation of Article 5.2(A)(ii) into the discussion—the "TI Country Concept." Why? Because Hyundai is trying to avoid the consequences of its own extraordinary growth. Rather than honor Article 5.2(A)(ii)—the sales-cap termination clause it helped create—Hyundai tries like the dickens to force the risk and expense of its

---

**26.** Since Hyundai has failed as a matter of fact to establish either *per se* patent misuse or just plain patent misuse due to tying, this Court does not reach the decision whether

Texas Instruments "purged" its alleged misuse—for there is no need to purge something that never existed.

own extraordinary growth onto Texas Instruments—*precisely what Article 5.2(A)(ii) was designed to avoid.* Much like its strained interpretation of the parties' License Agreement, it gets worse.

Hyundai carries its "TI Country Concept" into this Court and urges a strained interpretation of Article 5.2(A)(ii) contrary to what the extrinsic evidence now shows. Indeed, relying on New York law's inadmissibility of extrinsic evidence for the interpretation of unambiguous contracts, Hyundai actually urged an interpretation *opposite* to that of a patent portfolio cross-license. Despite being unable to consider the extrinsic evidence *which clearly shows this License Agreement to be a portfolio cross-license agreement,* this Court nonetheless rejected Hyundai's "TI Country Concept" and, for all practical purposes, held the License Agreement to be a portfolio cross-license agreement.

Then, six (6) days before the jury trial of this case, Hyundai amends its answer to include this defense of patent misuse. Despite a twenty-five million and two-hundred thousand United States dollar ($25,-200,000.00) jury verdict in its favor, Texas Instruments must undergo further delay as it prepares for this subsequent bench trial. And prepare for what? The re-appearance of Hyundai's "TI Country Concept." Hyundai's defense of patent misuse relies upon the "TI Country Concept's" "covered" versus "uncovered" artificiality already rejected by this Court.

Ever since it introduced its "TI Country Concept" on January 20, 1998, Hyundai has consistently done one thing: try to avoid the risk and expense of its own extraordinary growth. Rather than honor Article 5.2(A)(ii)—the sales-cap provision designed to insure the risk of Hyundai's extraordinary growth would fall on Hyundai *and not Texas Instruments* —Hyundai consistently tried to deflect the consequences of its extraordinary growth onto Texas Instruments.

Finally, it would be inequitable, and contrary to all notions of fairness, to allow Hyundai to claim that counting "uncov-ered" products toward the termination cap results in misuse, when Hyundai itself proposed a construction of the License Agreement that did the same thing.

Suffice it to say that Hyundai does not come to this Court with clean hands—just the opposite. Accordingly, equity does not lie with Hyundai.

## D. The License Agreement is Terminated—TERMINATED

It was with a tremendous amount of deja vu that this Court undertook this patent misuse defense discussion. In its February 4, 1999 *Memorandum and Opinion Order,* this Court ruled that the License Agreement terminated according to the automatic triggering of Article 5.2(A)(ii)—the sales-cap provision. In that opinion, this Court specifically rejected Hyundai's "covered" versus "uncovered" theory (the "TI Country Concept") with respect to the definition of "royalty bearing products" and, consequently, calculation of Hyundai's worldwide sales applicable to the sales-cap calculation. This Court thought it had laid to rest Hyundai's strained, artificial parsing of the License Agreement's language *by rejecting Hyundai's "TI Country Concept" and finding that the contract had, in fact, terminated.*

But nestled within that fifty-five (55) page, dead License Agreement (that Hyundai helped draft), Hyundai managed to discover (a mere six (6) days before trial) this defense of patent misuse. We've passed the point of beating a dead horse—now were tenderizing it. It is time, once and for all, for Hyundai to come to grips with the death of the License Agreement—a death brought about by Hyundai's own extraordinary growth.

## III. CONCLUSION

Hyundai's *per se* patent misuse defense fails for a variety of reasons. First, there is no such thing as *per se* patent misuse due to tying. Congress' passage of the Patent Misuse Reform Act of 1988 eliminated *per se* patent misuse due to tying.

Hyundai's reading of the Federal Circuit's subsequent *Virginia Panel* case mirrors its strained interpretation of the parties' License Agreement. This Court does not read *Virginia Panel* for the proposition that Congress failed to eliminate *per se* patent misuse due to tying. Second, assuming *arguendo* that *per se* patent misuse still exists (and it does not), Hyundai fails as a matter of fact to establish there are separate products; Hyundai fails to show these "separable" products are tied; and Hyundai fails to establish that Texas Instruments has power in a relevant market. Finally, Hyundai comes to this Court with the same, tired "TI Country Concept" already rejected by this Court in its interpretation of the parties' License Agreement. Rather than honor Article 5.2(A)(ii)—the sales-cap termination clause—and assume the risk and expense of its own extraordinary growth, Hyundai resurrects its previously rejected "TI Country Concept" to bolster its patent misuse defense. Well, this Court puts it down again. Hyundai does not come to this Court with unclean hands. Accordingly, even assuming Hyundai had established *per se* patent misuse or just plain patent misuse, this Court refuses to lend the support of equity to a party with such unclean hands.

In sum, Hyundai has significantly failed to make out the essential elements of its equitable patent-misuse defense. In light of this failure, and for the reasons set out above, this Court DISMISSES Hyundai's Sixth Affirmative Defense.

It is SO ORDERED.